United States District Court
Southern District of Texas
**ENTERED**
October 07, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BP ENERGY COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-19-3243 |
| | § | |
| GLOBAL HEALTH TECHNOLOGY | § | |
| GROUP, LLC ET AL., | § | |
| | § | |
| Defendants. | § | |

**MEMORADUM AND OPINION**

This is a breach of contract lawsuit stemming from two January 2019 Guaranty Agreements: one between BP Energy Company and an individual, Greg Lindberg; and one between BP and Global Health Technology Group, LLC.   BP Energy Company and the Guarantors, Lindberg and Global Health, have filed cross-motions for summary judgment.   The parties raise three sets of issues: (1) whether the obligations incurred under the Guaranty Agreements before their termination dates survived their termination dates; (2) whether the Guarantors have affirmative defenses to the breach-of-contract claims; and (3) how much BP can recover if the court finds that Lindberg and Global Health breached their obligations under the January 2019 Guaranty Agreements.  BP also moves for pre- and postjudgment interest.

Based on the pleadings; the motions, replies, and responses; the summary judgment record; the arguments of counsel at a hearing held in September 2020; and the law, this court grants BP's motion for summary judgment, (Docket Entry No. 26), and finds that  BP is entitled to payment from Lindberg and Global Health in the amount of $45,529,969.78, plus prejudgment interest in the amount of $1,137,305.33 as of July 8, 2020, and postjudgment interest at the rate prevailing when judgment is entered.  The court denies Lindberg's and Global Health's cross-motion for

1

summary judgment.  (Docket Entry No. 27).  BP must submit a proposed final judgment, after conferring with the defendants as to form, no later than October 16, 2020.

## I.  The Summary Judgment Record

This dispute stems from underlying agreements between BP and several related entities that provide retail electricity and natural gas: Agera Energy, LLC; Aequitas Energy, LLC; energy.me Midwest, LLC; and Agera Holdings, LLC (together, the "Agera Entities").  (Docket Entry No. 1 at 3; Docket Entry No. 27 at 2).  The relevant facts are largely undisputed.

In 2015, BP and the Agera Entities entered into an International Swaps and Derivatives Association Master Agreement ("ISDA Agreement") and a Preferred Supplier Agreement. (Docket Entry No. 26 at 2; Docket Entry No. 27 at 3–4).  Under these Agreements, BP supplied financial hedging, credit-enabled transactions, and electricity and natural gas to the Agera Entities. (Docket Entry No. 26 at 2; *see* Docket Entry No. 27 3–4).  The Preferred Supplier Agreement defined the ISDA Agreement as a "Related Agreement."  (Docket Entry No. 26-1 at 13).

In October 2018, BP learned that the Agera Entities had breached the Preferred Supplier Agreement because they had overstated more than $36 million in accounts receivable on their financial statements.  (Docket Entry No. 26 at 3; *see* Docket Entry No. 27 at 4).  The negotiations resulted in a Forbearance Agreement under which, among other things, the Agera Entities admitted liability for breaching the Preferred Supplier Agreement and the parties agreed to continue operating under the Preferred Supplier Agreement and the ISDA Agreement.  (Docket Entry No. 26 at 3; Docket Entry No. 26-6; Docket Entry No. 27-3).

In tandem with the Forbearance Agreement, BP executed Guaranty Agreements requiring Lindberg and Global Health to guarantee the Agera Entities' payment obligations under the Preferred Supplier Agreement.  The Preferred Supplier Agreement obligations were defined to

2

include payments due under "Related Agreements."  (Docket Entry No. 26-1 at 9; 40).  In January 2019, BP and the Agera Entities amended the Forbearance Agreement and entered into new Guaranty Agreements with Lindberg and Global Health.  (Docket Entry No. 26 at 4–5; Docket Entry No. 27 at 5–6).  These January 2019 Guaranty Agreements provided that Lindberg and Global Health had to pay the Agera Entities' outstanding obligations under the Preferred Supplier Agreement up to $51 million, if certain conditions precedent were met.  (Docket Entry Nos. 1-1, 1-2).

In April 2019, the Agera Entities failed to make a capital payment of $5 million, as required under the January 2019 Forbearance Agreement.  (Docket Entry No. 26 at 7; Docket Entry No. 26-9 at 2; Docket Entry No. 26-4 ¶ 12).  BP sent demand letters to both Lindberg and Global Health.  (Docket Entry Nos. 1-3; 1-4).  As of May 10, 2019, the date of the demand letters, the Agera Entities allegedly owed $35,437,153, plus accrued interest.  (Docket Entry No. 27 at 8; Docket Entry Nos. 1-3, 1-4).

The Agera Entities continued to miss or make only partial payments of the amounts in BP's invoices.  (Docket Entry No. 26 at 7).  BP sent a second set of demand letters to both Lindberg and Global Health on June 14, 2019.  (Docket Entry No. 26 at 7–8; Docket Entry No. 27 at 8–9; Docket Entry Nos. 1-5, 1-6).  As of that date, the Agera Entities allegedly owed BP $50,837,571.  (*Id.*).  On August 28, 2019, BP filed this lawsuit for breach of the Guaranty Agreements.  (Docket Entry No. 1).

In October 2019, BP terminated all transactions under the Preferred Supplier Agreement and the ISDA Agreement and declared all the Agera Entities' outstanding obligations immediately due and payable.  (Docket Entry No. 26 at 8; Docket Entry No. 27 at 9).  At that point the Agera

3

Entities allegedly owed BP over $144 million.  (Docket Entry No. 26 at 8; Docket Entry No. 27 at 9–10).   The Agera Entities filed for Chapter 11 bankruptcy the same day.  (*Id.*).

The Guaranty Agreements terminated on December 31, 2019.  (Docket Entry Nos. 1-1, 1-2 ("This Guaranty shall continue in full force and effect from the Effective Date until December 31, 2019.")).

In June 2020, the bankruptcy court confirmed the Agera Entities' plan.  As part of the plan, the bankruptcy court permitted BP to apply $99,439,739.51 in payments and credits to reduce the prepetition amount of $144,969,709.29, comprising the amount the Agera Entities owed to BP and the accrued prejudgment interest.  (Docket Entry No. 26 at 8–9; Docket Entry No. 26-4 at ¶ 20).  After applying these setoffs, the Agera Entities allegedly owed BP $45,529,969.78 as of July 8, 2020.  (Docket Entry No. 26 at 9; Docket Entry No. 26-4 at ¶ 21).

The parties cross-moved for summary judgment, responded, and replied.  (Docket Entry Nos. 26, 27, 30, 32, 37, 39).  They dispute whether Lindberg and Global Health's obligations under the January 2019 Guaranty Agreements remained enforceable after the Agreements terminated on December 31, 2019; whether the Guarantors have affirmative defenses to liability under the Agreements; and—if the Agreements remain enforceable—how much the Guarantors owe BP. The court considers each issue in turn.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome

of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.,* 709 F. App'x 287, 288 (5th Cir. 2018) (per curiam) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters. Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.,* 864 F.3d 326, 335 (5th Cir. 2017) (per curiam). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 Fed. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).  "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence*." Lamb v. Ashford Place Apartments*

*L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted).  In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor."  *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656, (2014) (per curiam)).

  **B.**  **Construing Guaranty Agreements**

  The Guaranty Agreements contain choice-of-law provisions that make New York law apply.  (Docket Entry Nos. 1-1, 1-2).  Under New York law "[a] guaranty is a promise to fulfill the obligations of another party, and is subject to the ordinary principles of contract construction." *Encore Nursing Ctr. Partners Ltd. P'ship-85 v. Schwartzberg*, 102 N.Y.S.3d 218, 220 (N.Y. App. Div. 2019) (quoting *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro,* 36 N.E.3d 80, 85 (N.Y. 2015) (citing *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*, 812 N.E.2d 936 ( N.Y. 2004)).  After the meaning of the guaranty "has been determined according to the ordinary principles of contract construction," the court must "strictly appl[y]" the guarantor's obligations.  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir. 1999) (quotation omitted).  Under ordinary contract principles, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Encore Nursing* 102 N.Y.S.3d at 220 (citations omitted).

  A continuing guaranty is a terminable contract under which the guarantor agrees to be secondarily responsible for the future obligations of a third party.  *See* RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 16 (1996).  When a contract provides for continuing performance over a period of time, a claim for damages accrues each time the defendants allegedly breach their

6

obligations.  *Beller v. William Penn Life Ins. Co. of New York*, 778 N.Y.S.2d 82, 86 (N.Y. App. Div. 2004) (citing cases).

### III.     The Summary Judgment Evidence

A party may support its factual assertions at the summary judgment stage by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). While a party may object that the facts asserted at the summary judgment stage are not supported by admissible evidence, the issue is whether the moving party can produce admissible evidence supporting its factual assertions at trial, not whether the summary judgment evidence would be admissible at trial.  *See* FED. R. CIV. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc*., 790 F.3d 532, 538 (4th Cir. 2015), as amended (June 24, 2015) (At summary judgment, "[t]he court may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form.") (quotation omitted) (alterations in original)).

Summary judgment affidavits must be based on personal knowledge.  *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005).  A court may reasonably infer personal knowledge from an individual's employment position and "sphere of responsibility." *Id.* (citation omitted).

The parties submitted the following exhibits as summary judgment evidence:[1]

---

[1] The court did not consider evidence submitted for the first time as exhibits to BP's reply brief, Docket Entry No. 37, because Lindberg and Global Health did not have an opportunity to respond to that evidence.  *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb*, 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992).

**BP**:

- The October 2015 Preferred Supplier Agreement (Docket Entry No. 26-1)

- The ISDA Agreement, amended October 2, 2015 (Docket Entry No. 26-2)

- Excerpts of the deposition of Mathew Michael, BP's director of retail energy provider commercial operations and a custodian of record for BP, and corrected excerpts of the deposition of Mathew Michael Docket Entry No. 26-3; Docket Entry No. 35-1).

- Affidavit of Mathew Michael (Docket Entry No. 26-4)

- PowerPoint presentation by the Agera Entities to BP (Docket Entry No. 26-5)

- November 2018 Forbearance Agreement (Docket Entry No. 26-6)

- November 2018 Guaranty Agreement between Lindberg and BP (Docket Entry No. 26-7)

- November 2018 Guaranty Agreement between Global Health and BP (Docket Entry No. 26-8)

- First Amendment to the Forbearance Agreement, dated January 25, 2019 (Docket Entry No. 26-9)

- January 2019 Guaranty Agreement between Lindberg and BP (Docket Entry No. 26-10)

- January 2019 Guaranty Agreement between Global Health and BP (Docket Entry No. 26-11)

- May 10, 2019 demand letter from BP to Lindberg (Docket Entry No. 26-12)

- May 10, 2019 demand letter from BP to Global Health (Docket Entry No. 26-13)

- Affidavit of Jose Luis Villanueva, BP's director of strategic credit and a custodian of record for BP (Docket Entry No. 26-14)

- Copy of BP's exposure calculation as of May 10, 2019, showing outstanding invoices of $35,437,153 to the Agera Entities (Docket Entry No. 26-15)

8

- June 14, 2019 demand letter from BP to Lindberg (Docket Entry No. 26-16)

- June 14, 2019 demand letter from BP to Global Health (Docket Entry No. 26-17)

- October 3, 2019 early termination letter from BP to the Agera Entities (Docket Entry No. 26-18)

- The July 8, 2020 final bankruptcy reconciliation between BP and the Agera Entities (Docket Entry No. 26-19)

- Email from Agera Entities' consultant, Tom Buck, to BP approving final reconciliation as of July 8, 2020 (Docket Entry No. 26-20)

- Lindberg's and Global Health's responses to initial discovery (Docket Entry No. 26-21)

- Invoices from BP to the Agera Entities (Docket Entry No. 30-5)

- BP's proof of claim in the Agera Entities' bankruptcy proceeding (Docket Entry No. 31-2)

- Excerpts from the docket in the Agera Entities' bankruptcy proceeding, *In re Agera Energy, LLC, et al.*, Case No. 19-23802 (Bankr. S.D.N.Y. May 9, 2020) (Docket Entry No. 31-3, 31-4, 31-5, 31-6, 31-7, 31-8)

**Lindberg and Global Health:**

- ISDA Agreement, amended October 2, 2015  (Docket Entry No. 28-1)

- Preferred Supplier Agreement as amended on May 15, 2017 and February 9, 2019 (Docket Entry No. 28-2)

- November 2018 Forbearance Agreement (Docket Entry No. 28-3)

- November 2018 Guaranty Agreements between BP and Lindberg and BP and Global Health (Docket Entry No. 28-4)

- Excerpts of the deposition of Jose Luis Villanueva, BP's director of strategic credit and a custodian of record for BP (Docket Entry No. 28-5; Docket Entry No. 33-2)

- First Amendment to the Forbearance Agreement (Docket Entry No. 28-6)

- January 2019 Guaranty Agreements between BP and Lindberg and BP and Global Health (Docket Entry No. 28-7)

- May 2019 demand letters (Docket Entry No. 28-8)

- June 2019 demand letters (Docket Entry No. 28-9)

- Excerpts of the deposition of Mathew Michael (Docket Entry No. 28-10; Docket Entry No. 33-5)

- October 3, 2019 early termination letter from BP to the Agera Entities (Docket Entry No. 28-11)

- Third Amendment to the Preferred Supplier Agreement, October 2019 (Docket Entry No. 28-12)

- Fourth Amendment to the Preferred Supplier Agreement, November 2019 (Docket Entry No. 28-13)

- Collection of BP's post-petition interest invoices (Docket Entry No. 28-14)

- BP calculations spreadsheet (Docket Entry No. 28-15)

- BP calculations spreadsheet as of October 4, 2019, and a screenshot of a BP calculations spreadsheet as of October 4, 2019 (Docket Entry Nos. 28-16, 28-17)

- BP's proof of claim in the Agera Entities' bankruptcy proceeding (Docket Entry No. 28-17)

- BP's post-petition supply invoices to the Agera Entities from November 2019 to March 2020  (Docket Entry No. 28-18)

- BP's April 22, 2018 letter to the Agera Entities on their breach (Docket Entry No. 33-3)

- Email from Jose Luis Villanueva confirming the Agera Entities' $5 million payment to cure the capital contribution breach of the Forbearance Agreement (Docket Entry No. 33-4)

- BP's interest invoices from November 2019 to March 2020 (Docket Entry No. 33-7)

The parties have each raised several objections to the opposing party's summary judgment evidence.  Many of these objections are inapt at the summary judgment phase.  *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself").  The court has considered each objection under the applicable law.

Lindberg and Global Health object to BP's Exhibit 26-1—the October 2015 Preferred Supplier Agreement— because the Preferred Supplier Agreement was subsequently amended. Lindberg and Global Health do not specify to which provisions of the October 2015 Preferred Supplier Agreement they object.  Nor do they identify any amendments that have materially changed the relevant sections of the Agreement.  (*See* Docket Entry No. 34 at 1).  In its response, BP provided amendments to the October 2015 Preferred Supplier Agreement that included a new "Event of Default" and the addition of the word "or" to the section outlining "Events of Default." These changes are not relevant to the issues the court must decide.  Lindberg and Global Health's objection to Docket Entry No. 26-1 is overruled.

Lindberg and Global Health object to excerpts of Mathew Michael's deposition testimony, Docket Entry No. 26-3,  on the basis that the excerpts were not properly attached.  (Docket Entry No. 34 at 1).  BP originally filed the exhibit with missing pages, but then filed a corrected exhibit. (Docket Entry No. 35, 35-1).  Lindberg and Global Health also assert that the court should not

consider the deposition excerpts because some of the deposition testimony was objected to.  The objections were to leading questions, an improper legal conclusion about the contractual terms in the answers, and that the testimony was not compliant with the best evidence rule.  (Docket Entry No. 34 at 1–2).

The issue at the summary judgment phase is not whether the parties have presented admissible evidence to support their motions for summary judgment, but whether they have shown that they will be able to present admissible evidence at trial.  *See* FED. R. CIV. P. 56(c)(2).  In any event, the court did not rely on the Michael's deposition excerpts in reaching its decision.  The objection is overruled.

Lindberg and Global Health object to paragraphs 4, 5, 6, 7, 9, 11, 12, 13, 15, 17, 18, 19, 20, 21, 22, 23 and 24 of Mathew Michael's affidavit.  (Docket Entry No. 26-4).  They assert that these paragraphs are misleading, contain improper legal conclusions, are not the best evidence, are not based on personal knowledge, are irrelevant, hearsay, fail to identify a factual basis, are not helpful to the trier of fact and/or are conclusory.  (Docket Entry No. 34 at 2–5).   Among these arguments, Lindberg and Global Health object that paragraph 4 of Michael's affidavit contains an inaccurate statement that BP and the Agera Entities entered into the Preferred Supplier Agreement and the ISDA Agreement at the same time.  (Docket Entry No. 34 at 2; Docket Entry No. 26-4 at 1).  This statement is technically inaccurate, because the Preferred Supplier Agreement was effective on October 2, 2015, while the ISDA Agreement was effective on May 5, 2015, and amended on October 2, 2015.  The court did not consider this discrepancy in its analysis.

Lindberg and Global Health's other arguments are overruled.  Michael is BP's director of retail energy provider commercial operations and a custodian of record for BP.  (Docket Entry No. 26-4).  Michael was designated as BP's corporate representative under Federal Rule of Civil

Procedure 30(b)(6).  (Docket Entry No. 36 at 3–4).  He prepared to serve in that role, and Lindberg and Global Health deposed him as BP's corporate representative.  (*Id*.)  The record supports finding that Michael had personal knowledge of the topics covered in the affidavit from his role at BP.  These topics included the terms of the Preferred Supplier Agreement and the ISDA Agreement; the nature of the contractual relationship between BP and Agera and BP and the guarantors; representations the Agera Entities made to BP; the events that triggered the Agera Entities' defaults; the events that triggered Lindberg's and Global Health's alleged breach; and, to the extent it relates to BP's business operations and interests, the Agera Entities' bankruptcy proceedings

Michael's affidavit does not contain improper legal conclusions.  Michael makes factual statements about the Agera Entities' finances, their payments to BP, and the steps BP took following the Agera Entities' actions.  When Michael uses legal terms such as "default" and "breach," he is describing what the Agreements say.  *See Jones v. Am. Council on Exercise*, No. CV H-15-3270, 2016 WL 6084636, at *9 (S.D. Tex. Oct. 18, 2016) (overruling an objection that a statement was an improper legal conclusion when the declarant was "merely reporting what [] websites say").  For example, Lindberg and Global Health object to Michael's statement that "the breach of the [Preferred Supplier Agreement] prompted BP and the Agera Entities . . . to enter into [the Forbearance Agreement]."  (Docket Entry No. 26-4 at ¶6; Docket Entry No. 34 at 3).  But the Forbearance Agreement explicitly acknowledged that the Agera Entities had breached the Preferred Supplier Agreement.  (*See* Docket Entry No. 36 at 6).  Michael is simply describing what the Forbearance Agreement says.  The objections to the Michael affidavit are overruled.

Lindberg and Global Health object to paragraphs 3, 4, 5, 7, 8 of Docket Entry No. 26-14, Jose Villanueva's affidavit.  (Docket Entry No. 34 at 5–6).  These objections are overruled.

13

Lindberg and Global Health argue that paragraph 3 contains an improper legal conclusion, but they do not identify specific words or phrases that are improper.  The paragraph describes the basis for Villanueva's personal knowledge and states that he "was involved with BP's efforts to address the Agera Entities' multiple defaults."  (Docket Entry No. 26-14 at ¶3).  As with the Michael affidavit, this is a description of fact; not a legal conclusion.

Lindberg and Global Health also assert that paragraphs 4 and 5 are not based on Villanueva's personal knowledge, fail to identify specific facts, contain improper legal conclusions, and are conclusory.  (Docket Entry No. 34 at 6).  These paragraphs detail the basis for BP's demand letters and the Guarantors' lack of response.  (Docket Entry No. 26-14 at ¶4–5).  The paragraphs are based on Villanueva's personal knowledge as the director of strategic credit and a custodian of record for BP.  They are supported by calculations of BP's exposure based on the Agera Entities' unpaid invoices that BP submitted as Docket Entry No. 26-15.  Notwithstanding Villanueva's use of the term "breach," these paragraphs describe facts based on Villanueva's personal experience and knowledge.

Lindberg and Global Health also argue that paragraphs 7 and 8 contain improper legal conclusions, but they do not identify offending terms or phrases.  (Docket Entry No. 34 at 6).  These paragraphs also describe facts based on Villanueva's personal experience and professional role.  (Docket Entry No. 26-14 at ¶7–8).

BP objects to Lindberg and Global Health's excerpts of Villanueva's deposition testimony, (Docket Entry No. 28-5); the Third Amendment to the Preferred Supplier Agreement, (Docket Entry No. 28-12); and to "Defendants' use of emails regarding the negotiations of the Guaranty Agreements [and] redlined prior drafts of Guaranty Agreements" as inadmissible parol evidence. (Docket Entry No. 40 at 1–2).  Lindberg and Global Health respond that BP's objections are

untimely and have been waived; that Villanueva's deposition is not inadmissible parol evidence; and that the objection to the Third Amendment to the Preferred Supplier Agreement should be overruled because it is relevant to the claims and defenses in the case.  (Docket Entry No. 42 at 1–5).  Because the court did not rely on this evidence in its analysis, BP's objections are moot.

BP also objects to the excerpts of Michael's deposition testimony submitted by Lindberg and Global Health, Docket Entry No. 28-10, asserting that Lindberg and Global Health have misconstrued it and that it is "misleading."  (Docket Entry No. 40 at 5–6).  Lindberg and Global Health respond that mischaracterization is not an appropriate objection to summary judgment evidence.  (Docket Entry No. 42 at 6).  The court agrees.  BP's argument is appropriate for a brief, not an evidentiary objection.  In any event, the court did not rely on the deposition testimony, and the objection is moot.

## IV.    The Guaranty Agreements

"On a motion for summary judgment to enforce a written guaranty, all that the creditor need prove is an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty."  *Encore Nursing*, 102 N.Y.S.3d at 220–21.  The parties do not dispute that Lindberg and Global Health guaranteed the Agera Entities' obligations under the Preferred Service Agreement up to $51 million.  (Docket Entry No. 1 at 1–2; Docket Entry No. 27 at 7).

### A.    The Evidence of the Underlying Debt

Lindberg and Global Health argue that BP is not entitled to summary judgment because it has failed to prove the Agera Entities' debt with admissible and competent summary judgment evidence, "i.e. its invoices," which Lindberg and Global Health assert are required by the best evidence rule.  (Docket Entry No. 32 at 15) This argument is unpersuasive.  As explained above,

a party may support its factual assertions at the summary judgment stage by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).

As summary judgment evidence of the underlying debt, BP provided an affidavit by Mathew Michael, BP's director of retail energy provider commercial operations and a custodian of record for BP. (Docket Entry No. 26-4). That affidavit states in part that

> [a]s of July 8, 2020, after applying all payments and credits, the total owed and outstanding by the Agera Entities to BP was $45,529,969.78, along with pre-judgment interest accruing per annum at the one-month LIBOR rate of interest for the invoicing period, plus 750 basis points. Those amounts owed are evidenced by BP's invoices sent to the Agera Entities.

(*Id.* at ¶ 21).

BP also submitted a bankruptcy reconciliation showing $99,439,739.51 in credits to be applied to the $144,969,709.29 owed by the Agera Entities. (Docket Entry No. 26-19). BP also submitted an email from its consultant confirming the reconciliation amount. (Docket Entry No. 26-20). BP did not provide the underlying invoices as an exhibit to its original motion for summary judgment, but it provided citations to electronically stored copies of those invoices that it had produced in discovery. (Docket Entry No. 26 at 9 n.47). BP's uncontroverted summary judgment evidence sufficiently shows that the outstanding debt to BP was $45,529,969.78 as of July 8, 2020, and that BP could produce admissible evidence of the debt at trial. (Docket Entry Nos. 26-4, 26-19; Docket Entry No. 26 at 9).

### B. The Termination Dates

Lindberg and Global Health also argue that they no longer have any obligation under the Guaranty Agreements because the Agreements terminated on December 31, 2019. (Docket Entry

No. 27 at 16–20).  BP argues that under New York law, the obligations incurred before December 31, 2019, while the Guaranty Agreements were in force, survive the termination date.  (Docket Entry No. 30 at 8–10).  Under New York law, the Guaranty Agreements are clear and unambiguous that the Guarantors' obligations, which accrued before the Guaranty Agreements' termination date, are enforceable after termination.

Lindberg, and Global Health agreed to pay debts accrued by the Agera Entities under the Preferred Supplier Agreement from January 25, 2019 to December 31, 2019, under the continuing Guaranty Agreements.  (Docket Entry No. 1-1 at 1, 5; Docket Entry No. 1-2 at 1, 5).  *See* RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 16 (1996) (a continuing guaranty is a terminable contract under which the guarantor agrees to be secondarily responsible for the future obligations of a third party).  Under New York law, "a continuing guaranty containing an expiration date requires the guarantor to pay obligations that were contractually binding, but were not yet due and payable, at the time the guaranty expired." *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc*., 812 N.E.2d 936, 936–37 (N.Y. 2004); *see also H. Muehlstein & Co. v. Sternberg*, 490 N.Y.S.2d 200, 201 (App. Div. 1985) (the expiration date of a guaranty agreement did not terminate the guarantor's liability for obligations incurred before the expiration date).

In *Louis Dreyfus*, the court considered guaranty obligations that accrued under two contracts to purchase gasoline and fuel oil.  812 N.E.2d at 938.  One party to the purchase contracts repudiated its contractual obligations.  *Id.*  The plaintiff in *Louis Dreyfus* did not exercise its contractual rights until more than two years after the repudiation, which was after the guaranty agreements had terminated.  *Id.*  The court found that because the purchase obligations became binding before the date the guaranty agreements expired, the obligations remained binding after the expiration date even though they had not become due when the agreements expired.  *Id.* at 941.

17

Lindberg and Global Health argue that their liability terminated on December 31, 2019, according to the Guaranty Agreements' termination provisions, which state that the Agreements "shall continue in full force and effect from the Effective Date until December 31, 2019." (Docket Entry No. 27 at 16–20; Docket Entry No. 1-1 at 5; Docket Entry No. 1-2 at 5). Lindberg and Global Health contend that *H. Muehlstein* did not announce a general rule and does not apply here, because the termination language here is more precise. 490 N.Y.S.2d 200. (Docket Entry No. 39 at 9). Lindberg and Global Health also argue that *Louis Dreyfus* is distinguishable because the disputed January 2019 Guaranty Agreements at issue here contain an express limitation of liability, which shows an intention not to be bound by any outstanding obligations accrued under the Guaranty Agreements after their termination. 812 N.E.2d 936. (Docket Entry No. 39 at 9–10). Lindberg and Global Health add that the analysis in the *Louis Dreyfus* opinion relied on the fact that the disputed guaranty agreements there also contained a revocation provision that expressly provided that obligations incurred under the agreements continued after their revocation. (Docket Entry No. 39 at 10).

These arguments are unpersuasive. In *H. Muehlstein*, the court considered a termination provision stating "[t]his guarantee shall be limited to one hundred thousand ($100,000.00) and will expire on December 31, 1983." 490 N.Y.S.2d at 200. This termination provision is similar to those in the January 2019 Guaranty Agreements. Lindberg and Global Health are correct that *H. Muehlstein* did not announce a general rule, but that court's reasoning is helpful here. The court reasoned that the expiration date provision was not "correctly interpreted as terminating defendant's liability on the guarantee for obligations incurred by [defendant] prior to [the expiration date] in the absence of a demand on the defendant prior to that date." *Id.* The court

added that it construed the expiration provision "to mean only that the defendant's guarantee would not extend to obligations incurred [after the expiration date]."  *Id*.

The court in *Louis Dreyfus* found that obligations incurred under a guaranty survived the expiration of that guaranty, "where [the guaranty] does not express a contrary intention" or "expressly shield [the guarantor] from liability."  812 N.E.2d at 937, 941.  The January 2019 Guaranty Agreements state that liability is "[s]ubject to the limitations described herein."  (Docket Entry No. 1-1 at 2; Docket Entry No. 1-2 at 2).  This statement does not express the intent to release or forgive liability for obligations incurred before the expiration of the Agreements, or to shield the Guarantors from liability.  (*See* Docket Entry No. 39 at 9).  The fact that the disputed guaranty agreements in *Louis Dreyfus* contained a revocation provision in addition to an expiration date does not distinguish that case.  The court in *Louis Dreyfus* applied New York law and held that a continuing guaranty with an expiration date required the guarantor to pay obligations that were contractually binding, but were not yet due and payable, when the guaranty expired.  812 N.E.2d at 936–37).

Here, as in *H. Muehlstein*, the Agera Entities' obligations not only had accrued, but were all due and payable before the Guaranty Agreements terminated on December 31, 2019.  The record evidence shows that BP's claim for breach of contract for the amounts in the demand letters accrued before BP filed this lawsuit in August 2019.  In May and June 2019, BP sent two sets of demand letters under the Guaranty Agreements to Lindberg and Global Health, seeking a total of $50,837,571 owed by the Agera Entities.  (Docket Entry Nos 1-3, 1-4, 1-5, 1-6).  The Guaranty Agreements provide that payment is due within 10 days of the receipt of a demand letter.  (Docket Entry No. 1-1 at 2; Docket Entry No. 1-2 at 2).  In October 2019, BP terminated the ISDA Agreement and the Preferred Supplier Agreement with the Agera Entities and declared their

outstanding obligations due and payable.  (Docket Entry No. 26 at 8; Docket Entry No. 27-11; Docket Entry No. 27 at 9).  The obligations BP seeks to enforce under the Guaranty Agreements were due and payable before the Guaranty Agreements terminated at the end of 2019.  The termination of the Guaranty Agreements does not make the underlying obligations already acquired unenforceable.

## V.    The Affirmative Defenses

Lindberg and Global Health asserted affirmative defenses in their answer in addition to the defense that the Guaranty Agreements' termination bars BP's claims.  The defenses include failure to perform conditions precedent, estoppel, waiver, ratification, failure to mitigate, election of remedies, comparative fault, that the claim is barred by the limits defined in the Guaranty Agreements, and lack of jurisdiction.  (Docket Entry No. 8 at 6-7).  Lindberg and Global Health argue that BP cannot recover because it has not overcome the affirmative defenses.  Each defense is examined below.

### A.    Failure to Satisfy Conditions Precedent

The conditions precedent to BP's right to enforce the Guaranty Agreements were: (1) a default on one of the guaranteed obligations; and (2) BP's written demand for payment of an obligation to Lindberg and Global Health.  (Docket Entry No. 1-1 at 5; Docket Entry No. 1-2 at 5).

BP issued demand letters to Lindberg and Global Health after the Agera Entities failed to pay BP invoices of $50,837,571.  (Docket Entry Nos. 1-5, 1-6).  Lindberg and Global Health argue that because BP has now been paid the amounts of those invoices, it has failed to satisfy the condition precedent to make a written demand for the additional $45,529,969.78 BP now seeks to recover.  (Docket Entry No. 32 at 21).

20

Lindberg and Global Health also contest the April 2019 default that BP asserts as the basis of its May 2019 demand letter.  Lindberg and Global Health argue that the Agera Entities paid the $5 million capital contribution that was the basis for the default on April 29, 2019 and that this $5 million payment complied with BP's request to cure because it was payment within five days of the notice of breach BP sent to the Agera Entities on April 22, 2019.

BP responds that the demand letters reflect ongoing defaults based on the Agera Entities' repeated failure to pay invoiced amounts.  (Docket Entry No. 37 at 21).  BP asserts that the continuing default is shown by the added $45,529,969.78 plus interest that the Agera Entities' owe to BP as of today's date.  (*Id.* ("In fact, the Agera Entities' default continues to today as evidenced by the $46,667,275.11 owed to BP on pre-bankruptcy invoiced amounts.")).

The Preferred Supplier Agreement identifies the failure to pay any amount due as an "Event of Default."  (Docket Entry No. 28-2 at 64).  The demand letters state that the Agera Entities "are in default" and "are and continue to be in default" because they "have failed to make payment in full of invoices."  (Docket Entry Nos. 1-3, 1-4, 1-5, 1-6).  The demand letters state that "the default or defaults described herein are not meant to be exhaustive of all defaults that may have occurred as of the date of this letter or may occur with the passage of time, giving of notice, or both."  (*Id.*). The Agera Entities were and are in default, and BP made the required demands for payment under the Guaranty Agreements.   BP satisfied this condition precedent.

**B.      Estoppel, Waiver, and Ratification**

Estoppel requires conduct inconsistent with the exercise of a right, and reliance by the party asserting estoppel on that inconsistent conduct, to its detriment.  *Exp.-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345, 351 (S.D.N.Y. 2008) (citing *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 59 (1984) ("the party claiming the estoppel must have

21

relied on its adversary's conduct in such a manner as to change his position for the worse . . . . that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." (quotation omitted) (footnote omitted)).

The affirmative defense of waiver applies "only if the plaintiff intentionally and knowingly waived its right to recovery." *Maxim Grp. LLC v. Life Partners Holdings, Inc.,* 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (citing *Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 499 (S.D.N.Y. 2005)). Waiver "must be clear, unmistakable, and without ambiguity." *Onanuga*, 369 F. Supp. 2d at 499. If a contract contains a no-waiver provision, a waiver must be in writing. *Maxim Grp. LLC*, 690 F. Supp. 2d at 310.

Ratification is the knowing acceptance of the unauthorized acts of an agent, express or implied. *Banco de La Republica de Colombia v. Bank of New York Mellon*, No. 10 CIV. 536 AKH, 2013 WL 3871419, at *8 (S.D.N.Y. July 26, 2013) (citing *Vargas Realty Enters. v. CFA W. 111 St., L.L.C.* 440 B.R. 224, 235 (S.D.N.Y. 2010)). Ratification must be intentional. *Id.*

The summary judgment record does not show that BP engaged in behavior inconsistent with the exercise of its contractual rights. BP's acceptance of partial payments from the Agera Entities is not estoppel, given that BP continued to pursue the outstanding amounts, and promptly sought payment under the Guaranty Agreements, including in this lawsuit. It is not clear how Lindberg and Global Health could have detrimentally relied on BP's conduct, which included an unequivocal demand for payment from the Guarantors. *See Exp.-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d at 352. In addition, the Guaranty Agreements require any waiver or amendment to be in writing. (Docket Entry No. 1-1 at 5; Docket

Entry No. 1-2 at 5).  The summary judgment record does not reflect any written waiver by BP. These affirmative defenses fail as a matter of law.

### C.    Failure to Mitigate

The failure to mitigate defense fails as a matter of law because BP did not have a duty to mitigate.  The Guaranty Agreements state that "the liability of Guarantor under this Guaranty shall be absolute, irrevocable and unconditional."  (Docket Entry No. 1-1 at 2; Docket Entry No. 1-2 at 2).  When a guaranty is unconditional and expressly obligates the guarantor to pay regardless of "any action, or failure to act" by the creditor, the creditor has "the choice as to how and when it is going to proceed in order to obtain satisfaction of the debt," and the guarantor cannot challenge the manner in which the creditor seeks to collect the debt.  *Citicorp Leasing, Inc. v. United Am. Funding, In*c., No. 03 CIV.1586 WHP, 2005 WL 1847300, at *6 (S.D.N.Y. Aug. 5, 2005) (citing *FDIC v. Schwartz*, 432 N.Y.S.2d 899, 901 (2d Dep't 1980);  *Gateway State Bank v. Winchester Builders, Inc*., 670 N.Y.S.2d 518, 519–20 (2d Dep't 1998); *Milliken & Co. v. Stewart*, 582 N.Y.S.2d 127, 128 (1st Dep't 1992) ("Where a guaranty states that it is primary and unconditional and binds the guarantor to pay immediately upon the default of the debtor, it is considered to be a guarantee of payment and upon default the creditor may proceed directly against the guarantor in the first instance.")

### D.    Election of Remedies

Lindberg and Global Health did not address this defense in their motion or briefs or point to evidence in the summary judgment record supporting it.  It is unclear what election of remedies they refer to.  (Docket Entry No. 8 at 6).  This defense does not provide a basis to grant Lindberg and Global Health's summary judgment motion or to deny BP's motion.

### E.      Comparative Fault

This defense is also insufficient.  It is unclear which parties, acts, or omissions Lindberg and Global Health refer to under the "comparative fault" label.  (Docket Entry No. 8 at 6).  In any event, comparative fault is unavailable as an affirmative defense in contract actions under New York law.  *Trumbull Equities LLC v. City.Com Media LLC*, No. 704961/14, 2015 WL 1866126, at *4 (N.Y. Sup. Ct. Apr. 08, 2015) (citing *Am. Express Equip. Fin. Corp. v. Mercado*, 34 A.D.3d 880, 882 (N.Y. App. Div.); *Pilewski v. Solymosy*, 698 N.Y.S.2d 660, 662 (N.Y. App. Div. 1999*); Viacom Int'l, Inc. v. Midtown Realty Co*., 652 N.Y.S.2d 740, 741 (1997)).  This defense fails as a matter of law.

### F.      The Guarantee Limits

The Guaranty Agreement have a $51 million liability limit.  (Docket Entry No. 1-1 at 2; Docket Entry No. 1-2 at 2).  BP initially sought to recover approximately $51 million, (Docket Entry No. 1 at 1), and now seeks an adjusted recovery of $45,529,969.78.  (Docket Entry No. 26 at 19).  This defense is unsupported by the record evidence.

### G.      Jurisdiction

The record reflects that the parties are completely diverse.  Lindberg and Global Health did not move to dismiss for lack of jurisdiction and have forfeited any objection to personal jurisdiction by their repeated filings and requests for rulings in this court.  *See Hamilton v. Atlas Turner, Inc*., 197 F.3d 58, 62 (2d Cir. 1999).  This defense fails as a matter of law.

## VI.    The Amount of Recovery

Lindberg and Global Health argue in the alternative that even if the January 2019 Guaranty Agreements are enforceable, undisputed facts show that liability is limited to amounts due under the Preferred Supplied Agreement, which does not cover amounts due under the ISDA Agreement

or minimum-volume fees.  (Docket Entry No. 27 at 20–31).  BP responds that the Guaranty Agreements covered "payment obligations arising under the Forbearance Agreement and the [Preferred Supplier Agreement]," and that these obligations include amounts due under the ISDA Agreement and minimum-volume fees.  (Docket Entry No. 30 at 10–19).  BP also argues that res judicata bars Lindberg and Global Health from collaterally attacking the bankruptcy court's final order confirming BP's subordinated claim of $16,698,538.95.  (Docket Entry No. 30 at 16–18).

### A.    Payment Obligations under the Preferred Supplier Agreement

### 1.    Recovery Under the ISDA Agreement

The parties agree that Lindberg's and Global Health's liability under the January 2019 Guaranty Agreements is limited to the Agera Entities' unpaid obligations due under the Preferred Supplier Agreement.  The parties disagree about what those obligations encompass.  Based on the plain language of the Agreements and the applicable law, the court finds that the payment obligations incurred and owing under the Preferred Supplier Agreement include those incurred and owing under the ISDA Agreement.

The January 2019 Guaranty Agreements provide that Lindberg and Global Health will cover "obligations arising under the Forbearance Agreement and under the [Preferred Supplier Agreement]."  (Docket Entry No. 1-1 at 1; Docket Entry No. 1-2 at 1).  Lindberg and Global Health assert that BP's $45,529,969.78 damages figure should be zero for two reasons.  First, only $16,698,539 is an outstanding debt under the Preferred Supplier Agreement.  (Docket Entry No. 27 at 23–26).  Second, that figure also includes $15,270,968 in minimum-volume fees and $1,427,570.95 in post-Preferred Supplier Agreement fees, which are not recoverable under the Guaranty Agreements.  (*Id.* at 26–29).

BP responds that the "payment obligations" under the Preferred Supplier Agreement are defined to include obligations "under any Related Agreement" and that the Preferred Supplier Agreement defines "Related Agreement" to include the ISDA Agreement.  (Docket Entry No. 30 at 10–14; Docket Entry No. 37-7 at 13, 40).  The plain language of the Preferred Supplier Agreement and the January 2019 Guaranty Agreements supports BP's position.  The Preferred Supplier Agreement defines "Related Agreement" as:

> collectively, the following agreements entered into by the Parties hereunder or by Agera Holdco: the ISDA Agreement, each Novated Transaction, all Confirmations, the Master Services Agreement and any other agreement between the Parties ( other than this Agreement and the Security Documents), including any other agreement to which any of BP's Affiliates are a party, entered into pursuant, or otherwise related, hereto.

(Docket Entry No. 26-1 at 13).

The Agreement also defines "Obligations" as:

> with respect to any Agera Party, each and every present or future payment or performance obligation or liability of such Agera Party under this Agreement, any Security Document, and, to the extent such obligation or liability arises out of a Transaction, under any Related Agreement.

(*Id.* at 9).

Section 10.1(a) of the Preferred Supplier Agreement provides that:

> [f]or each Delivery Month during the Planned Term, BP shall deliver to Agera Opco Entities one or more Invoices under the terms of the relevant Related Agreement(s) with respect to any outstanding Transaction thereunder. With respect to any Delivery Month, Agera Opco Entities may receive more than one Invoice from BP. Subject to clause (d), the applicable Agera Opco Entity shall make the payment due under each such Invoice pursuant to the terms of the Related Agreement, including by the date payment of such Invoice is due under the Related Agreement pursuant to which such Invoice was delivered.

(*Id.* at 40).   The Preferred Supplier Agreement incorporates payments due under the ISDA Agreement as obligations that are in turn covered under the January 2019 Guaranty Agreements. (*See* Docket Entry No. 1-1 at 1; Docket Entry No. 1-2 at 1).

Lindberg and Global Health assert that these payment obligations do not "arise under" the Preferred Supplier Agreement, as needed to make them binding on the Guarantors.   They quote a Second Circuit case for the proposition that "arising under" does not "encompass[] all claims that have some possible relationship with the contract, including claims that may only 'relate to,' be 'associated with,' or 'arise in connection with' the contract." (Docket Entry No. 39 at 13 (citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (citations omitted))).   In that case, the issue was whether a forum-selection clause that applied to claims "aris[ing] out of" a music royalties contract governed a copyright infringement action for the same music. *Phillips*, 494 F.3d at 387.   The court found that "the copyright claims d[id] not arise out of the contract because Phillips [] asserted no rights or duties under that contract [in pursuing his copyright claims.]" *Id.* at 391.   The record here supports a different result.   The Preferred Supplier Agreement obligated the Agera Entities to pay invoices issued under "Related Agreements," which were defined to include the ISDA Agreement.   (Docket Entry No. 37-7 at 9, 13, 40).   Lindberg and Global Health are liable for Agera Entities' obligations incurred under "Related Agreements," including the ISDA Agreement. Summary judgment is granted for BP on this issue.

### 2.    Minimum-Volume and Post-Preferred Supplier Agreement Fees

Lindberg and Global Health also argue that BP is not entitled to recover $15,270,968 in "forward-looking" minimum-volume fees that were calculated in October 2019 because the October 2019 amendments to the Preferred Supplier Agreement eliminated the Agera Entities' obligations to pay those fees.   (Docket Entry No. 27 at 27).    In addition, Lindberg and Global

Health assert that the post-Preferred Supplier Agreement fee of $1,427,570.95 is not recoverable. The post-Preferred Supplier Agreement fee was based on contractual "supply fees" for energy, natural gas, or financial products that had not been delivered when BP terminated the Preferred Supplier Agreement. (Docket Entry No. 26-1 at 1; Docket Entry No. 27 at 29). The same day that BP terminated the Preferred Supplier Agreement, however, the Agera Entities entered into an amended Preferred Supplier Agreement and continued to contract with BP for the supply and delivery of electricity and gas. (Docket Entry No. 27 at 29).

Lindberg and Global Health argue that to find them liable for the forward-looking post-Preferred Supplier Agreement fee when the Agera Entities continued to pay BP supply fees after the date of acceleration would impose liability beyond the scope of the Guaranty Agreements. (*Id.*). BP responds that the fees were calculated when it accelerated the amounts owed under the Preferred Supplier Agreement before it was amended, in keeping with the Agera Entities' agreement that BP could declare these fees to be due and payable in the event the Agera Entities defaulted. (Docket Entry No. 30 at 14–15). BP adds that preclusion bars Lindberg's and Global Health's collateral attack on the $16,698,538.95 for the minimum-volume and post-Preferred Supplier Agreement fees confirmed in the Agera Entities' bankruptcy plan. (*Id.* at 16–18). [2]

Preclusion does not bar Lindberg's and Global Health's defenses to the minimum-volume and post-Preferred Supplier Agreement fees.

Texas law governs the preclusion analysis. *Taylor v. Sturgell*, 553 U.S. 880, 891 n.4 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)) ("For judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the

---

[2] The Preferred Supplier Agreement defines "Post-[Preferred Supplier Agreement] Obligations" in relevant part as "each and every payment (including any and all Post-[Preferred Supplier Agreement] Fees) . . . that is scheduled to be performed or incurred after the end of the Planned Term." (Docket Entry No. 30-7 at 12).

rendering court sits.").   In Texas, "[t]he party relying on the affirmative defense of res judicata must prove (1) a prior final determination on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were or could have been raised in the first action."   *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010) (citation omitted).   The bankruptcy court was a court of competent jurisdiction and made a final determination on the merits.   *See Sigmar v. Anderson*, 212 S.W.3d 789, 794 (Tex. App. 2006) (there was "no dispute" that a bankruptcy court's final order satisfied the first element of claim preclusion).

The defenses to the minimum-volume fees and the post-Preferred Service Agreement fee that Lindberg and Global Health rely on here could have been raised in the bankruptcy court action. *See Zurita v. Lombana*, 322 S.W.3d 463, 474 (Tex. App. 2010), pet. denied ("[T]he subject matter of a suit is based on the factual matters that make up the gist of the complaint.   Any claim that arises out of those facts should be litigated in the same lawsuit." (citing *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 630 (Tex. 1992)).   But Lindberg and Global Health were not parties to the bankruptcy proceeding.   The issue is whether Lindberg and Global Health were in privity with the Agera Entities for this purpose.

"P[arties] can be in privity in at least three ways: (1) they can control an action even if they are not parties to the action; (2) their interests can be represented by a party to the action; and (3) they can be successors in interest, deriving their claims through a party to the prior action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996) (citations omitted).   The first two prongs are relevant here.   The summary judgment record does not establish that Lindberg or Global Health could control the bankruptcy court proceeding.   *See McNeil Interests, Inc. v. Quisenberry*, 407 S.W.3d 381, 389 (Tex. App. 2013) ("In determining whether privity exists through control

29

over a prior action, Texas courts have focused on whether an individual actively and openly participated in the prior proceedings to such an extent that it was clear that the individual had the right to direct them.") (quoting *Maxson v. Travis Cnty. Rent Account*, 21 S.W.3d 311, 316 (Tex. App. 1999, pet. dism'd by agr.).  There is a fact dispute about whether Lindberg is the chief shareholder of one or more of the parent companies of the Agera Entities and whether he has full ownership and control of Global Health.  (Docket Entry No. 1 at 3; Docket Entry No. 8 at 2).  Nor does the summary judgment record establish that Lindberg and Global Health's interests were represented in the bankruptcy proceeding.  A guaranty agreement does not establish that the guarantors' interests were adequately represented by the debtor in a prior proceeding. *Quisenberry*, 407 S.W.3d 381, 390 (Tex. App. 2013) ("[T]he dollar amount of the obligations" was not a sufficient commonality of interest to satisfy the second prong of the privity test.).

Preclusion aside, the language of the Guaranty Agreements supports granting summary judgment for BP, finding that it is entitled to the minimum-volume and post-Preferred Supplier Agreement fees.  These fees are recoverable under the January 2019 Guaranty Agreements and the Preferred Supplier Agreement in force when the parties signed those Guaranty Agreements.

The Preferred Supplier Agreement defines "Post-[Preferred Supplier Agreement] Obligations" in relevant part as "each and every payment (including any and all Post-[Preferred Supplier Agreement] Fees) . . . that is scheduled to be performed or incurred after the end of the planned term."  (Docket Entry No. 26-1 at 9).  Section 2 of the January 2019 Guaranty Agreements provides that:

> [s]ubject to the limitations described herein, the liability of Guarantor under this Guranty shall be absolute, irrevocable and unconditional irrespective of: . . .
> (b) any modification, extension or waiver of any of the terms of the agreement.

(c) . . . or any other amendment or waiver of or any consent to departure from any Agreement or any other agreement or instrument executed in connection therewith;

(Docket Entry No. 1-1 at 2; Docket Entry No. 1-2 at 2).  Under these terms, Lindberg and Global Health are liable for the minimum-volume fees calculated under the Preferred Supplier Agreement in force when the January 2019 Guaranty Agreements were signed, regardless of the subsequent amendments to the Preferred Supplier Agreement.

Section 18.1 of the Preferred Supplier Agreement provides that in the event of default, BP had the option to "declare the Payment Extensions and all other Obligations (including Post-[Preferred Supplier Agreement] Obligations then outstanding to be due and payable."  (Docket Entry No. 30-7 at 66).  The Preferred Supplier Agreement defines "Post-[Preferred Supplier Agreement] Obligations" in relevant part as "each and every payment (including any and all Post-[Preferred Supplier Agreement] Fees) . . . that is scheduled to be performed or incurred after the end of the Planned Term."  (Docket Entry No. 30-7 at 12).  BP is also entitled to the post-Preferred Supplier Agreement fee as a payment obligation under the Guaranty Agreements.

## B.    Additional Payments from the Agera Entities

Lindberg, Global Health, and BP agree that BP must apply any additional amounts it may receive from the Agera Entities to the underlying debt and subtract those amounts from the recovery BP seeks.  (Docket Entry No. 27 at 31; Docket Entry No. 30 at 20).  The court agrees.

## VII.    Pre- and Postjudgment Interest

BP seeks summary judgment that it is entitled to prejudgment interest of $1,137,305.33 as of July 8, 2020, under the Preferred Supplier Agreement's defined interest rate, and to post-judgment interest and costs.  (Docket Entry No. 26 at 11–12; Docket Entry No. 37 at 12–13; Docket Entry No. 26-1 at 7, § 10.3).    Lindberg and Global Health argue that BP's calculation of

31

prejudgment interest is not adequately supported in the record and that the calculation is based on an improper damages number.  (Docket Entry No. 32 at 18–19).  Lindberg and Global Health also argue that because BP has invoiced the Agera Entities for the interest and received payments, BP is not entitled to recover interest on the damage award against the Guarantors.  (Docket Entry No. 32 at 19–20; *see also* Docket Entry Nos. 33-7, 33-8).  BP responds that it seeks only the prejudgment interest on the Agera Entities' outstanding debts as of July 8, 2020.  (Docket Entry No. 37 at 12–13).

New York law provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. § 5001. Under § 5001(a), the prevailing party in a breach-of-contract action is entitled to prejudgment interest on its damages "as a matter of right." *United States Naval Inst. v. Charter Communs., Inc*., 936 F.2d 692, 698 (2d Cir. 1991). Where the contract specifies an interest rate, that rate determines the prejudgment interest. *Astoria Fed. Sav. & Loan Ass'n v. Rambalakos*, 49 A.D.2d 715, 716 (1975).

This court has found that BP is entitled to the damages it seeks.  While Lindberg and Global Health argue that BP has not submitted enough evidence to support its calculation of prejudgment interest, they do not assert that a different interest rate applies.  (Docket Entry No. 32 at 18–20). The Preferred Supplier Agreement defines the interest that is due on unpaid invoices.  (Docket Entry No. 26-1 at 7, § 10.3).  The uncontroverted evidence shows that BP is entitled to prejudgment interest at that rate.  As explained above, BP must apply any additional amounts it may receive from the Agera Entities to the underlying debt and subtract those amounts from the recovery BP seeks.  BP must make corresponding reductions to the prejudgment interest of $1,137,305.33.

In a diversity case, postjudgment interest is governed by 28 U.S.C. § 1961. *FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 147 (2d Cir. 2010).  BP is entitled to postjudgment interest under 28 U.S.C. § 1961(a), at the rate prevailing when the judgment is entered.

**VIII.  Conclusion**

This court grants BP's motion for summary judgment, Docket Entry No. 2), and finds that BP is entitled to payment from Lindberg and Global Health in the amount of $45,529,969.78, plus prejudgment interest of $1,137,305.33 as of July 8, 2020, and postjudgment interest at the rate prevailing when the judgment is entered..  The court denies Lindberg and Global Health's motion for summary judgment, Docket Entry No. 27.  BP must submit a proposed final judgment order, after consulting with the defendants as to form, no later than October 16, 2020.

SIGNED on October 7, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

33